IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ELIZABETH A. ERICKSON,

                       Plaintiff,

    v.

DEPARTMENT OF WORKFORCE
DEVELOPMENT, DIVISION OF
VOCATIONAL REHABILITATION OF
THE STATE OF WISCONSIN, MICHAEL
GRECO, JOHN HAUGH, and PATRICIA
NOLAND,

                       Defendants.

OPINION AND ORDER

15-cv-320-wmc

On Valentine's Day of 2014, the Wisconsin Department of Workforce Development ("DWD"), Division of Vocational Rehabilitation ("DVR"), dismissed Elizabeth Erickson from her probationary employment. In this civil action, she asserts claims against that state agency and certain of its employees for discriminatory termination under the Americans with Disability Act and for failure to accommodate under the Rehabilitation Act. In response, defendants moved for summary judgment on all claims. (Dkt. #35.) For reasons detailed more fully below, the court will deny that motion, finding Erickson has advanced sufficient evidence to require both of her claims to be heard by a lay jury.[1]

---

[1] In addition to defendants' motion for summary judgment, plaintiff filed a motion *in limine*, which seeks an order precluding defendants from offering expert testimony, having failed to disclose any such testimony by the deadline set in the preliminary pretrial conference order. (Dkt. #27.) In response, defendants state that they do not intend to present any expert testimony at trial. (Dkt. #33.) Accordingly, the court will deny this motion as moot.

UNDISPUTED FACTS[2]

**A.  The Parties**

 Plaintiff Erickson is and at all time relevant to this complaint an individual with a disability or disabilities.  DWD is an agency of the State of Wisconsin, and DVR is one of its divisions, whose purpose is to assist persons with disability to obtain, maintain and advance in employment.[3]  DVR has known of Erickson's hearing disability since at least 2002, because she wears a hearing aid to compensate partially for her loss of hearing and was a client of the agency on account of her hearing loss.

The individual defendants are all sued in their official capacities.  Defendant Patricia Noland is the Director of the Workforce Development Area ("WDA") 6, which has offices in Rhinelander, Wausau and Wisconsin Rapids.  From 2012 until 2015, defendant Michael Greco and defendant John Haugh were employed as DVR's Administrator and Bureau Director, respectively.  Both Greco and Haugh retired in 2015.  During the relevant time period, Greco, Haugh and Noland each directly or indirectly supervised, administered or managed Erickson's work at DVR.

In addition to the three named individual defendants, other DWD employees played some role in addressing plaintiff's disabilities.  From June 2012 through January 2015, Amanda Jorgenson was employed as DWD's Affirmative Action / Equal Opportunity Office and Training Section Chief.  Since March 2012, Jo Futrell has been

---

[2] The following undisputed facts are derived from the parties' submissions on summary judgment, after resolving all material factual disputes and reasonable inferences in plaintiff's favor as the non-moving party.

[3] Material to plaintiff's Rehabilitation Act claims, DVR receives funding from the federal government.

employed as a DWD Equal Opportunity Program Specialist.  In that capacity, Futrell was responsible for administering the Family Medical Leave Act programs for the department, and she assisted in the administration of the Affirmative Action and Equal Opportunity program.  Specifically, Futrell was responsible for processing requests for reasonable accommodations during the relevant period.

Next, Stephen Laesch was employed as DWD's Employment Relations Program Coordinator from July 2012 through November 2014.  In that capacity, he was responsible for the provision of expert/professional services in the development, communication, administration, and evaluation of DWD policy, practices, methodology and procedures in the area of employment relations.

Finally, Richard Clark was employed as a Vocational Rehabilitation Counselor Supervisor for DVR, from 2001 until 2013, at which time he retired.  Clark supervised all new hires that required clinical supervision in Workforce Development Area 6 from 2002 through August 2012.  In that capacity, he supervised Erickson, both in a group format and one-on-one, though that changed after Erickson made a formal request to have alternative supervision.

### B.  DVR Overview

As part of fulfilling its mission to obtain, maintain and improve employment for people with disabilities, DVR works with vocational rehabilitation consumers, employers and other partners.  DVR has eleven regions in the state that provide vocational rehabilitation services to people with disabilities, which DVR refers to as "consumers." DVR provides a range of services from career guidance and counseling; job search and

placement assistance; information and referral services; rehabilitation technology; vocational and other training; transportation; interpreter services; and diagnosis and treatment.

Each consumer works with a DVR counselor to establish an Individualized Plan for Employment ("IPE"), which assists the consumer in preparing for, securing and retaining an employment outcome that is consistent with the strengths, abilities and interests of the consumer.  DVR maintains a case record for each consumer in a computer software program called the "Integrated Rehabilitation Information System" ("IRIS"), which covers capturing information on goals, employment plans, and provision of services, among other data fields.

### C. Erickson's Hearing Disability

In November 2010, Erickson completed a "disability self-identification and accommodation survey" for DVR.  This was done while Erickson held a project position, which preceded the position that is central to her claims in this case.

Although not all disclosed in her survey responses, Erickson now identifies three, hearing related limitations.  First, she has had deafness in her right ear since early childhood as a result of a cholesteatoma.[4]  Erickson had surgery around the age of 2 or 3 to remove the cholesteatoma.  In 2003, at the age of 39, Erickson received her first hearing aid.  While she continues to use a hearing aid, Erickson contends that at times it

---

[4] A cholesteatoma is a "destructive and expanding growth consisting of keratinizing squamous epithelium in the middle ear and/or mastoid process."  "Cholesteatoma," Wikipedia, https://en.wikipedia.org/wiki/Cholesteatoma (last visited Sept. 13, 2016).  A symptom of cholesteatoma is hearing loss.

4

has negative effects due to attendant background noise distraction, distortions of certain sounds, and increased tinnitus.  As such, she often removes her hearing aid, and then puts it back in when it offers a benefit.

Second, Erickson also claims persistent tinnitus, which she experiences as "a combination of whistling winds, crickets, screeching and intermittent loud thumping." Defendants maintain that the court should disregard this proposed fact because Erickson's tinnitus diagnosis was never disclosed to DVR.  Indeed, plaintiff's own evidence of tinnitus impairment consists of a medical record from October 2014, which post-dates the events material to plaintiff's claims here.

Third, Erickson was diagnosed in September 2012 with a "weakness in her auditory working memory, which affects her ability to process and understand auditory information."  (Pl.'s PFOFs (dkt. #51) ¶ 12.c (citing Pines Decl., Ex. 1 (dkt. #52-1) (Kortenkamp Neuropsychological Eval.)).)  Defendants do not dispute that Dr. Kortenkamp's report touches on Erickson's working memory, but point out that same testing revealed "a relative weakness in her working memory [that] was within the average range though it certainly was not impaired nor was it significantly below her verbal perceptual abilities."  (Defs.' Resp. to Pl.'s PFOFs (dkt. #65) ¶ 12.c.)[5]  Dr. Kortenkamp also suspected that Erickson's relative weakness in auditory working memory was the cause of her difficulties in processing auditory information.  Finally,

---

[5] Defendants also point out that plaintiff's expert, Connie Nadler, "opined that auditory working memory deficit is not a diagnosis."  (*Id.* (citing Nadler Depo. (dkt. #48) 86).)

Kortenkamp noted that such difficulties would be worsened in a typical busy work environment, especially when coupled with Erickson's hearing loss.[6]

For purposes of summary judgment, defendants do not dispute that Erickson has difficulty hearing what is said by someone standing to the right side of her body with other noise present.  Erickson further contends that even if a person is talking to her directly face-to-face, she has difficulty understanding what that person is saying if there is any type of background noise.  Erickson also has difficulty identifying where a sound is coming from.  Because of these dynamics, Erickson often has to ask people to repeat themselves.  Moreover, Erickson represents that filtering out background noise and tracking speakers can be an extremely exhausting process and often gives her headaches.  As a result, lengthy meetings, including multiple meetings back-to-back, and listening in a noisy environment, even for an hour or less exhaust her.  Defendants do not really dispute this account, but point out that Erickson managed to sit for testing eight hours each day for two back-to-back days with plaintiff's expert without the use of CART services.[7]  Erickson also maintains that she is a visual learner as a result of compensating for these auditory issues.

In October 2012, Erickson met with Dr. Heidi Grosskopf to obtain an updated audiology evaluation.  Dr. Grosskopf confirmed severe rising to moderate mixed hearing

---

[6] Kortenkamp drafted a letter dated September 18, 2012, summarizing the results of his lengthier report and was submitted with plaintiff's November 2012 accommodation request, as discussed below.  *See discussion infra* Facts § E.iii.

[7] "CART" stands for "Communication access real-time translation."  "Communication access real-time translation," Wikipedia, https://en.wikipedia.org/wiki/Communication_access_real-time_translation (last visited Sept. 6, 2016).

loss in her right ear.  She recommended a new hearing aid to help improve hearing on Erickson's right side.  In mid-December 2012, Erickson received an updated digital hearing aid.[8]  While better than others she had tried, it was still not comfortable and she still experienced interference/distortion with some sounds and when people were very loud.

### D. Erickson's Pre-Employment Experience with DVR

In February 2002, Erickson applied for services from DVR, hoping to obtain financial assistance for a hearing evaluation and hearing aid.  In April 2002, Erickson was approved for DVR services.  At that time, she listed becoming a counselor as an employment goal.

In addition to helping Erickson formulate an IPE, DVR also provided her with financial aid to obtain her Master's degree.  In the spring of 2006, Erickson earned a Master of Science in Education (School Counseling) from University of Wisconsin-Oshkosh with a 3.968 GPA on a 4.0 scale.[9]

In January 2010, Erickson filled out an application for state-wide employment for DVR Counselor positions.  Both of Erickson's DVR Counselors encouraged her to apply. In her letter to DWD HR, Erickson indicated that the application was on the recommendation of her "two hearing-disability counselors" at the DVR-Oshkosh office. (Erickson Decl., Ex. 4 (dkt. #56-4).)  Erickson had several job interviews with DVR in

---

[8] Defendants note that the two month wait in securing the new hearing aid was due, in part, to Erickson's delay in returning to the audiologist to pick out a hearing aid.

[9] In June 1986, Erickson earned a B.S. from the UW-Oshkosh with a 3.672 GPA and graduated *cum laude*.

2010.  Typically, Erickson told her interviewers that she was a client of DVR, although she did not recall at her deposition whether she revealed the nature of her disability.

### E.  Erickson's Employment by DVR

#### i.    Project Position and Informal Disability Accommodations

In November 2010, DVR hired Erickson as a "vocational rehabilitation counselor-in-training" for a limited term project position.  Erickson was assigned to the Janesville DVR Office (WDA 11).[10]

On November 15, 2010, Erickson self-identified as an individual with a disability in completing a DWD form.   Erickson hand delivered the form and medical documentation to the Madison office to Georgina Taylor, the DWD Affirmative Action/Equal Opportunity Office at that time.  Erickson attached an audiogram report as medical documentation to the form, and indicated that she did so "for when/if I need an accommodation."  (Erickson Decl., Ex. 7 (dkt. #56-7) 2.)

At the same time, Erickson asked her supervisor, Suzanne Lee, for a special phone/headset because the phone setup in her office.[11]  Other than that, Erickson did not believe any accommodations were necessary.  In part, this was because the office supplied information in writing.   Erickson believed she was successful in the Janesville Office because of these "informal" accommodations.

Having learned that Erickson's position may be cut in a few months, Lee wrote a letter of recommendation on Erickson's behalf in June 2011, noting that she had

---

[10] At this time, Erickson remained a client of DVR.  Her case file was closed in March 2011.

[11] Apparently, the phone was awkwardly placed on Erickson's far right side.

demonstrated a keen eye for detail, had a cooperative and enthusiastic attitude for team work, excelled in fiscal management and had productive relationships with clients.  Lee concluded by stating, "In my opinion, she has the potential for a long and successful career as a Vocational Rehabilitation Counselor and would be an asset to any team." (Erickson Decl., Ex. 8 (dkt. #56-8).)     While acknowledging this glowing recommendation, defendants point out that Erickson's project position was eliminated because of the creation of a similar *permanent* position, yet Erickson was not hired for that position.  (Defs.' Resp. to Pl.'s PFOFs (dkt. #65) ¶ 58.)

### ii.     Permanent Position: Initial Hiring, Oversight and Responsibilities

In July and August 2011, Erickson applied, interviewed and was selected for a Vocational Rehabilitation counselor-in-training position with DVR.  Erickson began her employment with DWD as a DVR counselor-in-training in the Rhinelander Region (WDA 6) on August 15, 2011.

As a new permanent employee in the state civil service, Erickson was required to serve one year "probation" from August 15, 2011, to August 14, 2012.  All new DVR employees in their first year have a "Goals and Accomplishments Review" or "GAR" -- or at least are supposed to have a GAR -- at 3, 6, 9 and 12 months.  The purpose of the GAR is to measure how the probationary employee is meeting required performance standards.  The probationary employee's first-line supervisor completes the GAR and reviews it with the employee.  At the time of her hiring, Erickson's first-line supervisor was Kim Pomeroy, although she left that positon a few months later.

In November 2011, Erickson also began working under the clinical supervision of Richard Clark.  Because Erickson was pursuing a license to be professional counselor, she required clinical supervision from a licensed vocational rehabilitation counselor, which Clark was.[12]  With Pomeroy's departure, Clark also became her first-line supervisor.  This meant that in addition to providing clinical supervision, Clark was tasked with completing Erickson's GARs during the probationary period.  In addition, defendant Patricia Noland, who was hired by DVR as Director of the WDA 6 Region in February 2012, was Erickson's direct supervisor for day-to-day activities, although Erickson disputes that Noland was her sole supervisor.[13]  While the parties agree that Noland visited the Rhinelander office on a weekly basis after August 7, 2012, they also dispute how often she visited before then.

In her new position, Erickson was responsible for performing professional vocational rehabilitation counseling, which involved ensuring that appropriate vocational rehabilitation services were provided to DVR's consumers.  Her duties included:  (1) applying a combination of human development, rehabilitation, psychosocial or psychotherapeutic principles, procedures or services; (2) evaluating pertinent information concerning applications for services; (3) planning, organizing and implementing a

---

[12] As a requirement for the duties of the counselor in training position, Erickson applied for, and was granted on November 9, 2010, a four-year Wisconsin professional counseling training license by the Department of Rehabilitation and Licensing.

[13] Erickson contends more generally that Noland's management had a "negative effect on the offices as Noland gradually took on additional responsibilities."  (Pl.'s PFOFs (dkt. #51) ¶ 70; *see also id.* at ¶ 81.)  Erickson also notes an office-wide October 3, 2012, "intervention" meeting where concerns about caseload sizes and lack of confidence in counselors demonstrated by Noland were aired.  (*Id.* at ¶¶ 179-81, 203-05.)  Whether Noland's management style is material in assessing her critique of Erickson's performance, its relevance appears marginal at best.

rehabilitation program for disabled persons; and (4) establishing and maintaining cooperative working relationships with external agencies.

### iii.   Periodic Performance Evaluations and Additional Informal and Formal Disability Accommodations

Erickson's first GAR was completed and signed by Clark on January 10, 2012.[14] (Erickson Decl., Ex. 11 (dkt. #56-11).)   Clark's written evaluation indicated that Erickson was meeting her goals with two exceptions.   Under Goal 2A -- "Understand and be able to involve and cooperate with DVR consumer to jointly develop an IPE which has an identified employment goal, designed to address barriers determined in FAR, services, vendors, starting and ending dates, with objective measures of progress." – Clark wrote: "Not Evaluated.   Elizabeth has only developed one IPE at this point and this will be further evaluated at the end of the six months."   (*Id.* at 2.)[15]   Under Goal 3A -- "After training maintain an average active caseload of 60-110." -- Clark marked "Not Met," but also noted that "[e]fforts will be made to increase caseload over next 3 months."   (*Id.*)

Erickson's second GAR was March 6, 2012, seven months into her employment. All goals were again indicated as "met" except for two.   While defendants characterize one of those goals as "unmet," the form is simply blank under the goal, "Provide timely services in a team based environment to VR consumers to assist individual consumers in reaching appropriate employment outcomes and the team with obtaining successful

---

[14] The written evaluation reflects that the GAR meeting itself took place almost three week earlier, on December 20, 2011.  *Id.*

[15] Similarly, Goal 4B concerning the timing of IPE development was also marked as "Not Met," along with few other categories for which there were no opportunities for evaluation.   (Erickson Decl., Ex. 11 (dkt. #56-11) 4.)

rehabilitations." (Clark Decl., Ex. 1019 (dkt. #41-2) 2-3.) In his declaration, Clarke does not mention this goal; instead, his focus is on the goal of 16 successful employment outcomes at the end of the year, in contrast to Erickson's two some five months into her employment. (Clark Decl. (dkt. #30) ¶ 30.) On the other hand, the one "unmet goal" from her January 2012 GAR concerning caseload was now marked as met on this review.

Clark emailed this GAR form to Erickson and copied Noland on it. In his cover email to Noland, Clark also indicated that he had five cases he wanted to discuss with Erickson. Based on this entry alone, defendants would have the court infer that Clark had concerns about Erickson's performance at the six-month mark and expressed them to Noland, but the evidence does not support, much less compel, such an inference on summary judgment. On the contrary, plaintiff cites an email dated February 29, 2012, in which Clark forwarded Erickson's case notes to all staff as a good example of case authorization for them to follow. (Erickson Decl., Ex. 14 (dkt. #56-14).) Moreover, on March 29, 2012, Clark emailed Erickson inviting her to join the "Business Plan Committee" based on some suggestions she had made to a consumer. (Erickson Decl., Ex. 15 (dkt. #56-15).)

Some three to four months later, however, the records show Clark had significant concerns about Erickson's ability to become a counselor. On July 12, 2012, Erickson received a draft of her next GAR, the so-called "9-month" review.[16] On July 18, 2012, Clark met with Erickson to discuss this next GAR. While Clark and Erickson were

---

[16] Although defendants in their submissions describe it as the "9-month GAR," this review actually occurred 11 months into Erickson's probationary period. To add further confusion, Clark's contemporaneous communications describe this as the "final" GAR.

scheduled to meet at 8:00 a.m. Erickson did not arrive until 8:30. Due to another appointment on Clark's calendar, he was not, therefore, able to meet with Erickson as long as expected. Still, Clark documented his notes from the meeting.

The July 2012 GAR refers to one goal as unmet: "2A. Understand and be able to involve and cooperate with DVR consumer to jointly develop an IPE which has an identified employment goal, designed to address barriers determined in FAR, services, vendors, starting and ending dates, with objective measures of progress." (Noland Decl., Ex. 1001 (dkt. #38-2) 9.) As to Goal 2a, the GAR states: "Does Not Meet Standard. Review 6 of the 13 IPE's developed since the last review and all lack some aspect of expectations. There are IPE's that do not address barriers identified in the FAR, do not address lack of stable housing and do not have comprehensive assessment." (*Id.*) Relatedly, the July GAR noted under Goal 7B, "[c]onsult with peers and other team members to shares ideas and seek direction in the provision of services," needed improvement, specifically noting that "Elizabeth needs to routinely seek input to better meet IPE development expectations." (*Id.* at 12.) Clark also documented his concerns with specific IPEs in notes attached to the GAR. (Clark Aff., Ex. 1018 (dkt. #41-1).)

Erickson disputed these areas of concern, largely on the basis that she completed the IPEs in the way instructed by other supervisors, as well as by Clark himself. In addition, Erickson disputed Clark's assessment of inadequacies in the report based on the specific characteristics and abilities of particular consumers. Erickson further contends that Noland and Clark were often at odds themselves on how best to provide services. Finally, Erickson takes issue with considering some 44 newer cases, not assigned to her

until late May or early June in her July 2012 GAR, since she did not have sufficient time to make progress these newly assigned cases.

Nonetheless, there is no dispute that Clark had concerns about Erickson's IPE development and expressed those concerns to Erickson in the GAR, in an email about the GAR, and in an in-person review.  On her part, Erickson asked for guidance on how to meet Clark's expectations going into the July meeting, and specifically asked for guidance regarding a draft IPE after the meeting.  She never received a response to her question.

On July 26, 2012, Clark emailed DWD HR Director Seven Laesch, copied Noland, and asked to speak to him about Erickson, since she was nearing her probationary period, and he was now recommending that she not pass.  Clark also attached to this email the 6-month and 9-month GARs.  (Noland Decl., Ex. 1001 (dkt. #38-2).)  In a follow-up email dated August 3, 2012, Clark elaborated that Erickson had recurrent problems with IPE development:  "I have explained the issues and trained her to expectations.  She continues to do the job the same and ask for more training on the same issues." (Clark Aff., Ex. 1019 (dkt. #41-2) 1.)

In a subsequent email exchange, Laesch also indicated he needed information about specific performance issues for purposes of drafting a termination letter.  (Clark Aff., Ex. 1020 (dkt. #41-3) 3.)  In response, in an email dated August 6, Clark described how Erickson only had one IPE at her 3-month GAR in December 2011 and only had five by the time they met for her 6-month review in March 2012.  Even so, Clark acknowledged that the IPEs Erickson prepared were adequate.  While she developed 13

additional IPEs between March 2012 and July 2012, Clark expressed "continued issues with IPE development." (*Id.* at 1.)

On July 30, at 3:16 p.m., Clark sent Erickson an email asking her to attend a probationary status meeting with Noland and himself the next morning at 9:00 a.m. to discuss Erickson's failure to meet performance standards.   At that meeting, Erickson expressed confusion about what information her supervisors felt was missing from her IPEs and asked for additional training.   Erickson also indicated that she felt overloaded by the assignment of additional cases from departing counselors.   After the meeting, Clark sent Erickson a "final" 9-month GAR, but then on August 2, he retracted that "final" one and instead made the July 12 draft version the final, without correcting any of the issues raised by Erickson.

Noland, Clark and Erickson were scheduled to meet again on August 7, 2012, to discuss Erickson's probationary period.   Erickson contacted Noland and asked to meet with her before the group meeting to discuss the draft goals and accomplishments review that Clark gave her during their meeting on July 31, 2012.   On August 7, Erickson and Noland met for three and a half hours.[17]   During that meeting, Erickson complained about Clark and asked that someone else provide clinical supervision.   Erickson also told Noland for the first time that she had a hearing impairment and she had a disability certification on file at DWD's Madison office. (*See* discussion *supra* Facts § C.)

---

[17] Erickson complains about the length of some of her meetings with Noland, representing that they were mentally exhausting, and often ran into scheduled consumer appointments.

Defendants contend, and plaintiff does not dispute, that Noland was not aware that Erickson had a disability prior to this conversation.  During the meeting, the parties dispute what exactly was said regarding Erickson's disability.  Defendants maintain that Noland advised Erickson to contact DWD HR to address any disability accommodation request.  Plaintiff contends that Noland said:  (1) it was "cheesy" to be bringing up her disability now; (2) she would delay a request for accommodation if she received the request form; and (3) she would take 20 days to approve it or not, by which time, Erickson would be gone.  Plaintiff also maintains that Noland stated that because she could not tell Erickson had a disability, she did not believe Erickson had one.

Ultimately, the parties agree that all "formal" accommodation requests are handled by DWD's HR department, and Noland does not process or approve them.  If an employee *is* given an accommodation, she is simply noticed of the accommodation by HR.  The parties dispute whether Noland ever provided Erickson with so-called "informal" accommodations.

During the August 7, 2012, meeting, Erickson also requested that her probationary period be extended and that she receive additional training.  Defendants do not dispute this account, but challenge whether either would constitute a reasonable accommodation.  Noland further asserts that the request was irrelevant because the decision had already been made to extend her probationary period by five weeks to September 20, 2012, to account for Erickson's absences.  Noland also told Erickson not to "knock" this decision, not to "look a gift horse in the mouth," and that she should "go along with management and not complain" because that was in her "best interests."

(Pl.'s PFOFs (dkt. #51) ¶¶ 105-06.)   Erickson also contends -- and defendants do not dispute -- that defendant Noland acknowledged that her GARs reflect that, "for the most part," Erickson had met standards, Erickson found Clark's GAR "subjective" and she was "frankly surprised" by the errors in it.  (*Id.* at ¶¶ 107-08.)  Still, Noland refused to review the case file Erickson had brought to her attention that showed contradictions in the July 2012 GAR, maintaining that she would not be comfortable reviewing it without a clinical supervisor present.

The scheduled group meeting with Clark never happened.  Instead, in response to Erickson's request, Clark was removed as her clinical supervisor.  Erickson apparently failed to identify a replacement clinical supervisor before her employment was terminated, although the parties dispute whether it was Erickson's responsibility to identify a replacement.  Clark had no further involvement with Erickson after his removal except to inform her in an email dated September 11, 2012, that he had withdrawn as her clinical supervisor effective August 7, 2012, and that it was her responsibility to inform the Department of Safety and Public Services and to locate a new clinical supervisor.  (Noland Decl., Ex. 1006 (dkt. #38-7) 1-2.)  Erickson never told Clark that she had a hearing impairment and never asked him for an accommodation.

After that meeting, Noland noted her concerns about Erickson's performance, including that:  (1) the IPEs Erickson wrote were inadequate; and (2) Erickson possessed poor judgment, questionable professionalism, and failed to accept responsibility for her errors.  In particular, Noland took issue with Erickson's review of several consumer cases not assigned to her, though Erickson maintains that these were only reviewed for training

17

or some other legitimate purpose.  Noland also accused Erickson of creating "faux plans" or placeholders out of fear that a consumer would give Erickson a negative review for denying services.  Erickson disputes this as well.  In her notes, Noland also documented that she found it very difficult to speak to Erickson because she was confusing, and Noland had a hard time following her logic.

Late in the day on August 29, 2012, Noland informed Erickson of a GAR meeting scheduled for the next day at 8:00 a.m.  Shortly before the meeting on August 30, Noland gave Erickson a document completed by John Haugh.  On August 30, Noland met with Erickson to review this document, which she would be using to evaluate Erickson's performance.  (Noland Decl., Ex. 1038 (dkt. #38-19).)  Erickson contends that the document was described to her as a "Performance Improvement Plan," covering the period August 5, through September 20, 2012, but defendants now refer to it as a GAR.

On its face, the document is different from past GARs used with Erickson.  It describes performance areas, notes concerns about her performance, and sets forth action steps to address those performance concerns.  (*Id.*)  In particular, the document required that Noland or a counselor with a master's degree or other director review all of Erickson's IPEs and sign off on them before finalizing.  It also required Erickson to document her work activity.[18]

---

[18] Erickson contends that Noland approved nearly all of Erickson's IPE drafts as written, and of the 26 IPE plans Erickson wrote before August 31, 2012, she was never asked to revise or change any.

For her part, Erickson contends that the document contained numerous errors, and she refused to sign it.  Nonetheless, Noland gave Erickson until September 20 to satisfy the requirements listed in the document.  That same day, Noland sent an email to Laesch, which detailed Erickson's responses to the meeting.  (Noland Decl., Ex. 1005 (dkt. #38-6).)

On September 5, Erickson asked Noland if:  (1) she could have a personal representative at upcoming meetings; and (2) whether she was under a performance improvement plan.  Noland responded that the plan was not disciplinary in nature. Therefore, according to Nolan, Erickson did not have the right to representation nor to advanced notice of performance improvements plans.  Also on that same day, Erickson informed Lynda Hanold in the HR department of her concerns with meeting the reporting requirements within three weeks.

Noland and Erickson again met in person on September 6 and 13, October 24 and 30, and November 5, 2012, to review Erickson's progress and discuss any performance issues.  Noland provided Erickson with written notes from these meetings.  In addition, Noland and Erickson had a telephone meeting on October 3 to discuss her goals and performance review.  During the September 13 meeting, Erickson told Noland that she could not hear her and asked for all communication to be in writing.  Erickson also represents that during that meeting, Noland:  (1) refused to review Erickson's documents if they were not in the form of a summarized report; and (2) told Erickson that she was making it hard on herself.  Noland emailed Laesch and Haugh a summary of this meeting

19

and asked for permission to write up Erickson for a DWD work rule violation, and for working and sending emails after hours.[19]

The parties dispute whether Erickson reached out to HR on September 5, 2012, to request an accommodation.  Regardless, there is no dispute that on September 3, Laesch asked Amanda Jorgenson to reach out to Erickson regarding an accommodations request, and that she spoke with Erickson on September 11 and provided Erickson with paperwork on September 13.  On September 17, Erickson informed Jorgenson that she was working with her medical providers to complete the necessary forms and gave her the medical documentation she already had.  Erickson checked in again with Jorgenson on September 21, informing her that she was having trouble scheduling appointments with providers, but that she was still working on the forms.

On October 2, Noland gave Erickson an excel spreadsheet for her to keep track of the information Noland wanted regarding Erickson's caseload progress and the IPE progress of Erickson's customers.  Noland gave Erickson until October 19, to complete the project.  Erickson estimated that she would have to spend 25 to 40 hours to review

---

[19] On September 17, 2012, Laesch sent an email with an attached letter from Jorgenson to Erickson stating that DVR had requested and received approval to extend Erickson's probationary period by three months to December 16, 2012.  On November 1, Lawton, the Administrator of the Division of Merit Recruitment and Selection, for the Office of State Employment Relations approved the extension of Erickson's probationary period for an additional 3 months to March 16, 2013, to aid her in obtaining accommodations that would allow her to perform her job functions and to give her additional time to "achieve the knowledge, skills and abilities to competently perform the required tasks for her position."  (Pl.'s PFOFs (dkt. #51) ¶ 214.)  For reasons that are not entirely clear, on December 13, 2012, Jorgenson sent Erickson a letter informing her that DVR again requested and received approval to extend her probationary period two months to February 15, 2013.  The Administrator for DVR, defendant Michael Greco, had the discretion to grant up to a one-year extension of the probationary period under Wis. Stat. § 230.28(1).

between 100 and 125 consumer cases and provide the requested summaries.  Given Erickson's busy caseload, she informed Noland that she could not meet her deadline.  Moreover, the information Noland wanted was easily accessible via IRIS.

On October 4, Noland provided Erickson with another document setting forth expectations that were intended to replace the August 30th document.  (Erickson Decl., Ex. 36 (dkt. #56-36).)  The document contains much of the same information as the prior version, but it includes "comments" describing progress or concerns on these objectives, though the copy provided to the court is difficult to read.[20]

On October 9, Noland provided a GAR review update to Laesch and Haugh, in which she conveyed that Erickson seemed frustrated by her inability to understand what Noland wanted from her.  Also in October, Noland reported that while she relaxed the 30-day requirement for customer contacts at a staff meeting, extending it to 60 or 90 days, Erickson still had to comply with the more exacting 30-day requirement.

By November 2012, Erickson's case load had grown to about 160 cases, which was the second highest case load in her district.  As a result, she was not able to keep up with it or complete Noland's additional reporting requirements.  On November 26, 2012, Noland emailed DVR's Bureau Director, defendant John Haugh, a 6-page summary of ethical/performance issues concerning Erickson.  (Noland Decl., Ex. 1009 (dkt. #38-10).)  Plaintiff objects to these notes and moves to strike them on the basis of hearsay, but the

---

[20] Also in October, Noland accused Erickson of falsifying consumer medical reports and Functional Assessment Reviews ("FARs") in order to make consumers eligible for services.  After Erickson emphatically denied this accusation, Noland did not respond, other than to note Erickson's denial.

notes appear admissible as business records, and if so, any hearsay objection to what "EE" reportedly stated in the notes would be admissible as statements of a party opponent.

Regardless, Noland could testify to these perceived performance issues without entering the notes into evidence. The notes detail specific issues with Erickson, including failing to conduct due diligence to determine whether a consumer died, closing a consumer case file because of a no show appointment without any phone call from Erickson and authorizing services for a consumer that did not match a job goal, among other concerns. The notes also detail consumer concerns, including complaints that she did not return calls, sent "improper letters to non-engaged consumers," and made inappropriate and irrelevant comments in consumers' case notes. Erickson also apparently allowed a consumer to redact part of a psychological evaluation. Finally, the notes state that Erickson only had 11 case closures after 16 months of employment, which defendants contend did not meet expectations. (*Id.* at 2.) From this, Noland recommended that Erickson's probationary period should not be extended.

On November 1, 2012, Erickson faxed her completed disability accommodation form to Jorgenson as DWD's Affirmative Action / Equal Opportunity Chief. She also provided a medical certification on November 7, which contained the letter from Dr. Kortenkamp discussed above, which explained that Erickson would benefit from "having as much information as possible presented in a visual format." (Jorgenson Decl., Ex. 1032 (dkt. #39-9).)

On November 14, Erickson sat down with Jo Futrell of DWD Human Services to discuss various ideas for accommodations, including providing written responses, materials and directions on expectation on training, CART services and other kinds of speech recognition software.   On November 20, Futrell provided Erickson with a modified accommodation proposal based on their discussion.   Futrell explained that she intended to share this with Erickson's supervisor, and if there was agreement, the next step would be administrator approval.   On November 27, Erickson asked Jorgenson about the status of her accommodation request.

Of course, while Erickson was seeking an accommodation, as reflected above, she was also subject to a demanding performance review.   On December 13, 2012, after Erickson's probationary period had been extended for two additional months, Erickson asked Jorgenson for advanced notice on what her GAR expectations would be, whether there would be accommodations in place, whether the GAR would extend backward to her start date of August 15, 2011, and whether anyone had addressed Erickson's heavy caseload or if it would be taken into consideration.   The next day, Jorgenson responded that Erickson should contact Jo Futrell with questions and that the accommodation would be in place shortly.

On December 13, 2012, DVR formally granted Erickson's reasonable accommodation requests.   In an "Accommodation Memorandum" from Administrator Greco, the following accommodations were granted:

> A. Responses and directions for training, work assignments, and expectations will be provided to you in writing.

23

a. For team meetings, we will implement a standard format for minute-taking, to include details of policy interpretations and procedural discussions[.]

b. For training, we will provide written training materials for in-person trainings.

c. For work assignments and evaluations, we will provide specific work assignments in writing. General expectations that will be used as a basis for evaluation or on the GAR will also be provided to you in writing in advance of performance reviews.

B. Cart Services will be made available to you for use in staff meetings and trainings.

a. The Cart Services will be available for group meetings and trainings, and/or remotely by phone for one-on-one meetings. You will use your own discretion to schedule the services for individual meetings with coworkers and management.

b. DVR will provide written instructions for working with the Cart Services; however,

c. Cart Services will not include printed transcripts.[21]

(Greco Decl., Ex. 1022 (dkt. #40-2).)  Transcripts were not provided because of the cost estimate of $5 per page.

This memorandum, however, was not mailed until January 3, 2013, and Erickson did not receive it until January 5.   On January 4, Noland *read* the CART services instructions to Erickson.  Erickson contends that Noland read them loudly and slowly as if Erickson was "deaf and dumb."  (Pl.'s PFOFs (dkt. #51) ¶ 231.)  Erickson never asked DVR for CART services or any other reasonable accommodation to her disabilities for the one-on-one interviews that she had with DVR consumers.

---

[21] The memorandum also notes that Erickson's request for audio recording of training information and work directions is denied.

On January 31, 2013, Noland sent Erickson a document setting forth expectations for her probationary period from August 15, 2012, to January 21, 2013, and stated that she and Erickson would have a GAR review meeting the next day on February 1. During the February 1st meeting, Noland stated that she had discovered new concerns with Erickson's performance in recent weeks, and that those concerns had nothing to do with having accommodations in place, which are addressed below in the next section of this factual summary.[22] Noland then asked Erickson to sign the document, something Erickson explained that she could not do so until she had time to review it and prepare a response. Specifically, Erickson noted that several of the critiques were based on her performance before accommodations were in place. Erickson also pointed out some factually incorrect information, which Noland agreed to change.

On February 12 or 13, 2013, Noland left Erickson a voice-mail and sent her an email regarding a pre-termination meeting scheduled for 8:00 a.m. on February 14. Erickson did not receive these messages because she was attending a district-wide meeting and a fiscal training session. On February 13, Erickson hand delivered to Noland her review and response to the February 1st document.

The pre-termination meeting lasted 10 minutes. Due to the limited notice, Erickson could not use CART services during the meeting. Erickson advised defendant Greco by email that she had not been provided necessary accommodations. On February

---

[22] At some point, concerns also arose about Erickson's daughter being in the office and Erickson putting on makeup during work hours. Erickson contends that these concerns were overblown, and also raises her own challenges based on Noland's alleged reliance on a receptionist to seek out criticism of Erickson.

14, Erickson nevertheless received a letter, signed by Greco and Haugh, terminating her employment.   Noland read the letter to Erickson loudly and slowly, until Erickson interrupted and told her it would be better if she read it herself.

OPINION

In her amended complaint, Erickson asserts (1) a violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.*, based on DVR's termination of her employment; and (2) a violation of the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA" or "ADA"), 42 U.S.C. § 12101, *et seq.* against the individual defendants in their official capacities for failure to provide accommodations.   The Rehabilitation Act, 29 U.S.C § 794, provides in pertinent part:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]

Similarly, Title I of the ADA, 49 U.S.C. § 12112, provides in pertinent part:

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

The ADA describes various ways an employer can discriminate on the basis of disability, including failing to make reasonable accommodations and denying employment opportunities, which includes termination of employment.   42 U.S.C. § 12112(b)(5)(A), (B); *see also Brumfield v. City of Chi.*, 735 F.3d 619, 630 (7th Cir. 2013)

(explaining that the ADA's prohibition of discrimination on the basis of disability includes "discharging an employee on the basis of disability," as well as "failing to make reasonable accommodations").   Similarly, the Rehabilitation Act also permits claims based on discriminatory termination and failure to accommodate.  *Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th, & 22nd Judicial Circuits*, 601 F.3d 674, 678 & n.2 (7th Cir. 2010) (analyzing a failure-to-accommodate claim under the Rehabilitation Act by reference to the standards applicable to such claims under the ADA).[23]

Regardless of which Act applies, as evidenced by the lengthy factual section above, and the competing factual pictures painted by the parties from the same set of disputed facts just discussed, a jury is required to suss out the ultimate factual issues surrounding plaintiff's alleged claims for discriminatory termination and failure to accommodate. Indeed, defendants maintain persuasively that Erickson's performance was woefully inadequate, particularly when it comes to the quantity of her production during her period of probationary employment, which arguably did not improve even after reasonable accommodations were granted.   Add in the lateness of plaintiff's formal request for meaningful accommodations, and defendant's case has substantial appeal, perhaps literally depending on the jury's verdict.

On the other hand, plaintiff points out that:  (1) Noland acknowledged at the end of January that the primary performance concern, Erickson's IPEs, had improved; (2) the

---

[23] It is not clear why plaintiff structured her complaint in the way that she did.  In particular, why bring a termination claim against DWD under the Rehabilitation Act (as opposed the ADA) and why assert failure to accommodate claim against her former supervisors in their official capacity under the ADA (as opposed to the Rehabilitation Act)?

January 31, 2013, assessment that formed the basis for Erickson's termination largely consisted of information pre-dating January 5, the effective date of accommodation; (3) Erickson was not able to use certain accommodations due to management decisions, such as scheduling important meetings with little notice;[24] and (4) Erickson was not given enough time to show improvement given that there were only 28 business days between the effective date of accommodation of January 5, and her termination date of February 14.

## I.  Proper Defendants

Before addressing the merits of plaintiff's claims under Title I of the ADA and the Rehabilitation Act, an initial question concerns who are the appropriate defendants.  As an initial matter, the Rehabilitation Act only covers those entities who receive federal funding.  Here, the evidence demonstrates and defendants do not dispute that DVR is a recipient of federal funding.[25]

Plaintiff appears to assert an ADA failure to accommodate claim against individuals, not the DVR.  If those individuals are being sued in their official capacity, the claim is the same as if it has been asserted against DVR.  *See Norfleet v. Walker*, 684

---

[24] For example, Erickson contends that she was not able to fully utilize the CART services because meetings were either scheduled with too short of notice, meetings were cancelled, or the agenda was changed and the scheduled court reporter was not available to attend the portion of the meeting warranting use of the CART services.

[25] Since DVR is a "division" of DWD, it may not be an independent legal entity for purposes of suit, although the court has found cases where it seems to be named as an independent party. Even if DWD is the proper party, plaintiff has named it as a defendant.  For ease of discussion, the court will refer to the defendant as DWD and its division simply as DVR unless specifically noted.

F.3d 688, 690 (7th Cir. 2012) (stating that a Rehabilitation Act claim against state department of corrections employees is a "lawsuit . . . against a state agency"). Moreover, there is no basis for individual liability under the ADA *or* Rehabilitation Act. *See Stanek v. St. Charles Cmty. Unit Sch. Dist. No. 303*, 783 F.3d 634, 644 (7th Cir. 2015) (citing *Walker v. Snyder*, 213 F.3d 344, 346 (7th Cir. 2000), *abrogated on other grounds by Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001) (explaining that "as a rule there is no personal liability under Title II" of the ADA); *Silk v. City of Chicago*, 194 F.3d 788, 797 n.5, 798 n.7 (7th Cir. 1999) (finding no individual liability under ADA, and explaining that Rehabilitation Act is nearly identical)). Additionally, more recently, the Seventh Circuit made clear in *Tri-Corp Hous. Inc. v. Bauman*, 826 F.3d 446, 449 (7th Cir. 2016), that a plaintiff cannot use § 1983 as a vehicle to hold a defendant individually liable for a claim for damages under the ADA or Rehabilitation Act. In light of this, the court will consider whether plaintiff has stated claims of discriminatory termination and failure to accommodate against her former employer, DWD. Of course, the individual defendants' actions, as well as other DWD/DVR employees, will determine whether DWD is liable.[26]

Finally, there is a question of whether the remedies differ between the two claims. Suits brought by state employees seeking money damages against the state for violations of Title I of the ADA are barred by the Eleventh Amendment. *See Tadder v. Univ. of Wis.-Rock Cty.*, No. 13-CV-105-WMC, 2013 WL 3943498, at *4 (W.D. Wis. July 30, 2013)

---

[26] In light of this discussion, the court need not take up defendants' odd challenge to Noland's liability, in which defendants argue that plaintiff's claim does not fit within *Ex Parte Young*, 209 U.S. 123 (1908). To the extent Noland remains as a defendant, it will be in her official capacity and, therefore, such a claim will function the same as a claim against DVR itself.

(citing *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 360 (2001)).   The Rehabilitation Act, however, waives sovereign immunity.   *See Sossamon v. Texas*, 563 U.S. 277, 291 (2011) (discussing § 1003 of the Rehabilitation Act Amendments of 1986, 42 U.S.C. § 2000d–7, which "expressly waives state sovereign immunity for violations of section 504 of the Rehabilitation Act of 1973," among other claims).   As such, the court will assume the availability of monetary damages for both her claims of discriminatory termination and failure to accommodate.[27]

## II. Discriminatory Termination

To prevail on a discriminatory termination claim under the Rehabilitation Act, Erickson must demonstrate:

> (1) she is disabled within the meaning of the statute; (2) that she was otherwise qualified for the job in question; (3) that she was discharged or the subject of other adverse action solely because of her disability; and (4) the employment program of which her job was a part received federal financial assistance.

*Felix v. Wis. Dep't of Transp.*, No. 15-2047, 2016 WL 3618299, at *6 (7th Cir. July 6, 2016).   Defendants concede, at least for purposes of summary judgment, that the first

---

[27] The parties also agree that to recover damages plaintiff must demonstrate intentional discrimination. *Strominger v. Brock*, 592 F. App'x 508, 511 (7th Cir. 2014) (citing 42 U.S.C. § 12133 (ADA); 29 U.S.C. § 794a(a)(2) (Rehabilitation Act); *Barnes v. Gorman*, 536 U.S. 181, 184–89 (2002); *CTL v. Ashland Sch. Dist.*, 743 F.3d 524, 528 n.4 (7th Cir. 2014)).   The Seventh Circuit has yet to determine the appropriate standard for showing intentional discrimination, in particular whether discriminatory animus is required, or a lesser showing of deliberate indifference.   *See Strominger*, 592 F. App'x at 511-12 (noting the circuit split, citing *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 262–63 (3d Cir. 2013) (deliberate indifference), and *Carmona–Rivera v. Puerto Rico*, 464 F.3d 14, 18 (1st Cir. 2006) (discriminatory animus)).   The court need not resolve this tension here, other than to note it and advise the parties to be prepared to brief the appropriate jury instruction.

and fourth elements are met, but seek summary judgment on the basis that plaintiff cannot demonstrate that she was otherwise qualified for the counselor in training position under the second element or that she was discharged solely because of her disability under the third element.

## A. Otherwise Qualified

As for the second element, defendants contend that Erickson was not otherwise qualified to perform the essential functions of a counselor-in-training position with or without accommodations.   Specifically, defendants contend that "[i]t is an essential function of a DVR counselor to develop IPEs that are appropriate for the consumer," and that Erickson cannot demonstrate that she can fill this essential function.   (Defs.' Br. (dkt. #36) 13.)

The core problem with defendants' motion is that the characteristic of being able to produce appropriate IPEs is not a clear-cut characteristic, as the ability to lift a certain amount of weight, to drive or to ambulate might be.   In other words, this is not a case where an objectively discernable function of the position is clear cut and there is no factual dispute as to the plaintiff's inability to perform it, even with reasonable accommodations.   For in those types of cases, courts are faced with a much more straightforward position to grant summary judgment to defendant on the basis that plaintiff failed to put forth sufficient evidence to demonstrate that the function is not essential.   *See, e.g.*, *Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016) (affirming grant of summary judgment, finding ability to walk a sales floor was an essential function of sales job and plaintiff had failed to put forth evidence that she could

31

perform that function even with a medical boot); *Peters v. City of Mauston*, 311 F.3d 835, 845 (7th Cir. 2002) (affirming grant of summary judgment, finding "heavy lifting" an essential function of a construction position and finding no dispute that plaintiff could not perform such lifting); *Basith v. Cook Cty.*, 241 F.3d 919, 928 (7th Cir. 2001) (affirming district court's entry of summary judgment on defendant's behalf, finding delivery of medication, and the physical requirements of delivery, an essential function of a pharmacist position and plaintiff could not meet those physical requirements).

Instead, this case turns on subjective factual questions that are very much in dispute. Among these would include:  what constitutes an appropriate IPE; whether Erickson was producing appropriate IPEs; and whether she could have produced more and better IPEs if accommodations had been in place. Here, Erickson had the educational background and certification required for the counselor-in-training position. Whether she was otherwise qualified to perform the job based on subjective characteristics, like organizational ability or sound judgment, cannot be determined in defendant's favor on the record at summary judgment. To the contrary, Erickson has presented evidence that initially there were no concerns about the adequacy of her IPEs, but rather about the number of IPEs completed. Approximately 11 months into her employment, concerns apparently developed about the quantity and quality of her IPEs as well. Even then, however, plaintiff challenges those concerns based on discrete cases, as well as inconsistencies in directions by her supervisors and others. Moreover, plaintiff points to her heavy caseload, including an assignment of large batches of new cases due to departing counselors, and the additional work Noland required as part of Erickson's

32

ongoing performance reviews.  Even more critically given the nature of plaintiff's claims, a jury could find that Erickson could have produced adequate IPEs in terms of both quality and quantity if she had reasonable accommodations in place for the entirety of the performance review period on which defendants rely in terminating her employment, rather than only at the tail-end of her employment.  *See Bultemeyer v. Fort Wayne Cmty. Schools*, 100 F.3d 1281, 1285, 1284-85 (7th Cir. 1996) ("Bultemeyer may have been qualified, because he may have been able to perform the essential functions of the job with reasonable accommodation. FWCS simply did not give him a chance to demonstrate this.").

All of this is to say that Erickson has raised genuine issues of material facts as to whether she was qualified to perform the counselor-in-training position.  *See Brown v. Smith*, No. 15-1114, 2016 WL 3536619, at *2 (7th Cir. June 28, 2016) ("The essential-function inquiry is a factual question, not a question of law."); *see also Hawkins v. George F. Cram Co.*, 397 F. Supp. 2d 1006, 1023 (S.D. Ind. 2005) ("While Cram repeatedly emphasizes that its primary goal in downsizing was to retain only those who were able to 'multitask,' the precise meaning of the term remains unclear. . . .  The evidence presented does not establish the meaning of the term to the extent that the court may, as a matter of law, determine whether Hawkins is able to perform this 'essential function.'").

### B. Causation

Defendants also seek summary judgment on the basis that plaintiff cannot satisfy the third element of her Rehabilitation Act claim -- that she was terminated because of

her disability.[28]   Specifically, defendants argue that the evidence demonstrates that Erickson was terminated not because of her hearing disability, but because of her "poor attitude, deficient performance, and questionable professionalism as a counselor-in-training."  (Defs.' Br. (dkt. #36) 19.)  The court will deny summary judgment based on this argument as well, largely for the same reasons articulated above with respect to the second element.

Here, plaintiff relies on the so-called direct method of proof to establish the causation element of her discrimination claim.  Under the direct method, "a plaintiff can present either direct or circumstantial evidence to meet its burden."  *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011).  "Direct evidence requires an admission by the decision maker that his or her actions were based upon the prohibited animus."  *Id.*  Since such admissions are uncommon, it is also permissible to

---

[28] Defendants latch onto the causation standard under the Rehabilitation Act of "*solely* by reason of disability," as compared to "on the basis of disability" under the ADA, likely because defendants view the former language as stricter.  In light of the language of the ADA and the Seventh Circuit's interpretation of that standard, the court views the Rehabilitation Act's "solely by reason of disability" and ADA's "on the basis of disability" as a distinction without a difference.  *See Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010) (holding that the ADA's "because of" language requires a "but-for" causation standard, providing no room for the more lax motivating factor standard in Title VII claims); 7th Cir. Jury Instr. § 4.02 (2015 rev.), http://www.ca7.uscourts.gov/Pattern_Jury_Instr/7th_cir_civil_instructions.pdf (defining causation requirement under the ADA as "Defendant would not have [taken action] if Plaintiff had not had a disability, but everything else had been the same.").  Regardless, for the reasons discussed below, the court finds that plaintiff has put forth sufficient evidence from which a reasonable jury could find that her termination was solely by reason of her disability.  In all other respects, the standards are the same.  *See, e.g.*, *Steimel v. Wernert*, 823 F.3d 902, 909 (7th Cir. 2016) ("Because the relevant provisions of the Rehabilitation Act and its regulations are materially identical to their ADA counterparts, courts construe and apply them in a consistent manner." (internal citations and quotation marks omitted)); 29 U.S.C.A. § 794 (d) ("The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201 to 12204 and 12210), as such sections relate to employment.").

rely entirely on "circumstantial evidence that allows a jury to infer intentional discrimination." *Id.* "The type of circumstantial evidence that a plaintiff may produce to survive summary judgment includes: (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Id.* (citing *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 586-87 (7th Cir. 2011); *Burnell v. Gates Rubber Co.*, 647 F.3d 704, 708 (7th Cir. 2011)).

Plaintiff posits two core factual circumstances, albeit both very much in dispute, from which a reasonable jury might infer causation:  (1) defendants' concerns about Erickson's performance and ultimate termination were a pretext for discrimination based on her disability; and (2) defendants terminated Erickson based on performance issues that largely pre-dated and would have been addressed by reasonable accommodations (or material to her claim, post-dated an inadequate accommodation).

As for the first theory, Erickson has put forth evidence that:  (1) her IPEs were adequate, if limited in number, for the first 11 months of employment; (2) she was given mixed, contradicting guidance on how to complete IPEs; (3) defendants' concerns about specific IPEs were unwarranted for various reasons; (4) defendants precipitously and unreasonably increased an already heavy caseload, requiring her to consider newly assigned cases without adequate time to develop and implement reasonable accommodations; and (4) a performance improvement plan created additional,

unnecessary work, making it difficult for her to focus on the primary areas of concern -- the quality and quantity of her IPEs.  Coupled with Noland's alleged comments about Erickson's disability and requests for accommodation being "cheesy," this evidence forms a sufficient basis for a reasonable jury to find the causation element satisfied.

As already alluded to, plaintiff has an even stronger argument, which is bolstered by expert testimony (*see* Nadler Rept. (dkt. #25)), that defendants' performance concerns were due to Erickson's disability.  Defendants' consideration of her performance before reasonable accommodations were in place and only providing six weeks for the accommodations to be in place (even assuming those accommodations were adequate) before terminating her employment also provides a basis for a reasonable jury to find causation here.  *See Walters v. Mayo Clinic Health Sys.-Eau Claire Hosp., Inc.*, 998 F. Supp. 2d 750, 768 (W.D. Wis. 2014) ("[A] reasonable jury could find that plaintiff's mental health issues contributed to her attendance problems.  Based on this finding, the jury could in turn conclude that disciplining Walters and terminating her employment was indeed discriminatory.").

## III.  Failure to Accommodate Claim

The ADA requires employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]."  42 U.S.C. § 12112(b)(5)(A).  "In order to establish a prima facie case of failure to accommodate under the ADA, 'a plaintiff must show that: (1) she is a

36

qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability.'"  *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1176 (7th Cir. 2013) (quoting *Kotwica v. Rose Packing Co.*, 637 F.3d 744, 747-48 (7th Cir. 2011)).

"After an employee has disclosed that she has a disability, the ADA requires an employer to 'engage with the employee in an "interactive process" to determine the appropriate accommodation under the circumstances.'"  *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1061 (7th Cir. 2014) (quoting *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005)); *see also* 29 C.F.R. App. § 1630.9 ("Once an individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the individual with a disability.").

Here, the record reflects that Erickson disclosed her disability to DVR as an employee at least by November 2010, by submitting a disability self-identification and accommodation survey for the DWD-DVR.  Of course, a reasonable jury might find DVR's awareness of her disability dates back to 2002, given Erickson's role as a consumer of DVR services as someone with profound hearing challenges.  Given Erickson's early disclosure of her disability, DVR arguably had an obligation to engage in an interactive process at that outset of her permanent employment in August 2011, rather than waiting for Erickson to make a formal request for an accommodation a year later.

Regardless, by September 2012, Erickson made a formal request for accommodation and worked with DVR's HR department in an interactive process. Plaintiff does not appear to challenge Futrell and Jorgenson's actions during this process. Instead, her focus is on Noland's failure to account for the process of securing reasonable accommodations in her simultaneous review of Erickson's performance.  As detailed above, Erickson represents that Noland refused to provide Erickson written materials, use other visual aids or shorten lengthy meetings, all of which could have compensated for Erickson's hearing loss or at least a reasonable jury could so find on this record.

While these actions alone may not be sufficient to support a failure to accommodate claim, the record further reflects that Erickson's ultimate CART accommodation was only in place for less than six weeks before she was terminated. Indeed, during that period, Erickson had, if anything, increased difficulty using the accommodations that were provided, because lengthy meetings were being scheduled at the last minute or being rescheduled such that Erickson could not secure a court reporter. As such, plaintiff contends that defendants thwarted her efforts to use the accommodation.

Still, defendants contend that the performance concerns driving plaintiff's termination had nothing to do with having accommodations in place.  As this court explained in *Walters v. Mayo Clinic Health Sys.-Eau Claire Hosp., Inc.*, 998 F. Supp. 2d 750 (W.D. Wis. 2014), however, this contention itself rests on factual determinations:

> Defendant then contends that "nearly all of Walters' attendance problems . . . had absolutely nothing to do with any mental health issues and therefore required no accommodation."  But this statement rests on a factual

> determination:   while a reasonable jury *could* find that Walters' absences were unrelated to her disability and therefore defendant need not have offered an accommodation, a reasonable jury could also find -- and the record certainly supports a finding -- that Walters' attendance slip-ups during the relevant period of time were due to a sharp decline in her mental health during that same period.

*Id*. at 765-66.  If anything, the case is stronger here.  A reasonable jury could find that defendants' decision to terminate Erickson's employment within a few weeks of establishing a possible accommodation constitutes an effective denial of her request for an accommodation.  As such, the court will deny defendants' motion for summary judgment on Erickson's failure to accommodate claim as well.

## ORDER

IT IS ORDERED that:

1) Plaintiff Elizabeth Erickson's motion *in limine* to preclude defendants from presenting expert testimony (dkt. #27) is DENIED as moot.

2) Defendants the Department of Workforce Development, Division of Vocational Rehabilitation of the State of Wisconsin, Michael Greco, John Haugh and Patricia Noland's motion for summary judgment (dkt. #35) is DENIED.

Entered this 21st day of September, 2016.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

39